SILLS, P.J.
I respectfully dissent. The interests of a child of a very high income parent are best served by having enough money for the child to go to college, graduate or professional school; or, if the child is not so inclined, to have a tidy nest egg at the beginning of adult life. Under the model of child support law proffered by the majority opinion, however, while Ashley will have enough money to buy a thousand outfits for her Barbie doll, purchase several divisions of toy soldiers, or commission her own Nintendo game, she may have nothing for college. After all, as the majority tell us, it is beyond the jurisdiction of a court to make even the slightest provision for a child’s college education in a child support order, even in a case where a child has a very high income parent and the statutory guidelines yield a number grossly in excess of a child’s current needs.
I cannot believe the Legislature ever intended such an anomalous result. When the income of a supporting parent is so high that it is in substantial *132 excess of a child’s reasonable current needs, true “sharing” in a very high income parent’s standard of living means putting something away for college or adult life, not squandering it on childish things or indirectly (and gratuitously) increasing the custodial parent’s standard of living.
I
California’s relatively inflexible statutory scheme for determining child support has come in for a significant amount of judicial criticism. At the lower income level, notes Justice King, the scheme is “creating havoc and undue hardship” by not leaving “payors with sufficient money on which to live.” (In re Marriage of Fini (1994) 26 Cal.App.4th 1033, 1042, fn. 10 [31 Cal.Rptr.2d 749].) Even family support bureaus of district attorneys’ offices agree. (Ibid.)
At the middle income level the statutory formula gives us absurd results. For example, where both parents work and equally share custody of two children, more money is allocated for the living expenses of the two children than for the adults. (In re Marriage of Fini, supra, 26 Cal.App.4th at p. 1042, fn. 10.)
And at the high end, we have this case, where the formula yields a number beyond any sane correlation with the child’s needs. Here, however, the trial judge brought some intelligence and common sense to the process and still managed to comply with the statute. His effort merits a medal, not reversal.
The trial judge reasonably ascertained this five-year-old’s needs to be $3,000 a month and made an order providing that those needs would be met. If anything, he erred on the high side. I most strenuously disagree with the dicta in the majority opinion that $3,000, “standing alone” would constitute an abuse of discretion. Even under the flawed statutory scheme we now have a court has every right to depart from the formula number where “the amount determined under the formula would exceed the needs of the children.” (Fam. Code, § 4057, subd. (b)(3).)
But the judge was faced by another statutory consideration besides need— the idea that “[c]hildren should share in the standard of living of both parents” (Fam. Code, § 4053, subd. (f)) and the consequence that the formula will yield an unreasonably high number in high income cases—a problem the Legislature recognized in section 4057, subdivision (b)(3) of the Family Code.
What to do? The trial judge’s solution was elegant: Put extra money in trust, so it would be available for the child when she needed it for a college *133 education and later in her adult life, and put restrictions on the trust so that the custodial parent did not reap a windfall from the statutory formula.
The judge was well within the law in establishing the trust. Section 187 of the Code of Civil Procedure confers on courts all means necessary to carry their jurisdiction into effect, and where “the course of proceeding [is] not specifically pointed out” by statute, “any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the this code.” By setting the child’s needs at a very high level ($3,000) and then establishing a trust for yet additional money, the judge harmonized the intent of the Legislature that children “share” in a higher income parent’s standard of living while at the same time retaining a decent proportion between the order and the child’s needs—even at a high income level.
II
So why do my colleagues find no “strong showing of necessity” to justify the trust? Essentially, they set forth three reasons at pages 129 through 130 of the opinion: (1) $3,000 was too low by itself; (2) child support orders cannot, as a matter of law, provide for future contingencies (they cite the 1956 decision in Primm v. Primm (1956) 46 Cal.2d 690 [299 P.2d 231]); and (3) supporting noncustodial parents ought not to maintain any control over moneys paid as support.
On the first point, my colleagues say, “$3,000 would not even come close to providing Ashley with the amenities provided by the lifestyle she was used to before her parents separated.” (Maj. opn., ante, at p. 129.) I respectfully submit that this proposition is self-evidently unbelievable. In the vernacular: Aw come on. Gimme a break. Ashley was a five-year-old for Pete’s sake.
What was this “lifestyle” she enjoyed prior to separation? There is a limit to the degree to which a five-year-old needs to live in a manner suitable for profile by Robin Leach on Lifestyles of the Rich and Famous no matter how high his or her parent’s income. A child’s need for shelter does not mean having money enough to live in a palace worthy of Nebuchadnezzar, complete with hanging gardens and its own river running through it. Suffice to say that the majority opinion does not point to even one “amenity” that $3,000 a month tax free will not afford her.
On the second point, my colleagues misapprehend the significance of the enactment of a child support formula to determine support awards and the need to harmonize differing aspects of the same statutory scheme. Primm v. *134 Primm, supra, 46 Cal.2d 690 was decided long before the enactment of statewide uniform guidelines for child support based on the complicated formulae in Family Code section 4055 which are to be considered “presumptively correct in all cases” except when there are “special circumstances.” (See Fam. Code, § 4053, subd. (k).) When Primm was decided, child support was not the functional equivalent of a tax, yielding in some cases revenue far beyond a child’s current needs, and therefore it followed that the “jurisdiction” of the trial court was necessarily limited to “conditions and circumstances” existing at the time of the support order. (Primm, supra, 46 Cal.2d at p. 694.)
The enactment of an inflexible formula system, however, changed the legal landscape in which Primm was rooted. Now, in high income cases, inflexible guidelines yield numbers grossly in excess of children’s reasonable needs. If the trial judge had taken the rule in Primm to its real logical conclusion, he would have stricken any requirement to pay anything above the $3,000 (very generous) needs level. Rather, the trial judge wisely made an order which provided for what (provident) rich people have always done for their children—put something away for the future.[1]
My colleagues fail to realize that the best way for children to be supported according to their parents’ “station in life” (Fam. Code, § 4053, subd. (a)),[2] in a way which “takes into account each parent’s actual income,” (§ 4053, subd. (c)), in which each parent “support[s]” his or her children “according to his or her ability,” (§ 4053, subd. (d)), and where children “share” in their parents’ “standard of living” (§ 4053, subd. (f)) is—when the formula amount exceeds the current needs of the children—to make intelligent arrangements for the children’s future. Anything else represents a kind of perverse improvidence, in which the law is interpreted, as the majority impliedly do today, to require that money be spent now.
There is nothing in the child support statutes to encourage profligacy, and we should not be so clueless as to interpret those statutes to encourage wanton spending for its own sake. If there is one virtue that the child of rich *135 parents must learn, it is fiscal restraint. Ashley is far better served by an order which puts money away for her education or gives her a nest egg when she starts adult life than by blowing it all on a rich and famous “lifestyle” in her elementary school years.
The third point on which my colleagues rely to strike down the trust is borne of an application of a correct principle to the wrong case. As trial judges, we have all experienced the incessant din from payor parents professing to be willing to make child support payments as long as they didn’t have to make those payments to their despised ex-spouses. There is something of a bad reaction to the echo of that din here, where the majority opinion concludes that the law does not provide for “control” by a payor parent of child support funds. (See maj. opn., ante, at p. 130.)
Granted, most of the time the position of the majority opinion is well taken. It is impossible, when it comes to the basic needs of children—shelter primarily—to avoid a practical benefit to the custodial parent (see In re Marriage of Hubner (1988) 205 Cal.App.3d 660, 668 [252 Cal.Rptr. 428]) though again that should not mean that the custodial parent gets to live in the hanging gardens of Babylon at the supporting parent’s expense.
By the same token, practical reality demands that the custodial parent have control over moneys paid to meet a child’s necessities. Anything else risks micromanagement by an often embittered noncustodial ex-spouse of the day-to-day decisions necessary to the custodial parent’s household.
But there can be no hard and fast rule in California precluding any control, in appropriate cases, of at least some money paid as child support. A hard and fast rule would make a mockery of joint legal custody (Fam. Code, § 3085), because it would mean that major decisions within the purview of both parents would be effectively controlled only by the custodial parent. Particularly in a high income case where there is money available to meet more than basic necessities, a hard and fast rule against any kind of control unfairly gives the custodial parent power over the kinds of discretionary spending which would not exist but for the income of the supporting parent. The “power of the purse” would effectively destroy any meaningful joint legal custody arrangement and repose in the hands of the custodial parent the major life decisions affecting the child.
In a high income case the primary benefit to the child from his or her “participation” in the supporting parent’s “affluence” is—or, in any intelligent ordering of priorities should be—money for education and for the future, not current extravagance. And that means moneys must be set aside *136 for those purposes—in essence an investment portfolio should be created. If the idea of joint legal custody is to be taken seriously at all, the management of such a portfolio is necessarily a matter of joint control by both parents, not discretionary control by the custodial parent. The money is there for the child, not the custodial parent, and there is no reason to accord the custodial parent a favored status in its management.
In this case, the extra $4,000 was prudently designated for Ashley’s education, extraordinary expenses, and, if not used by the age of majority, to give her a start in life.[3] As with the dichotomy between formula number and need, the trial judge’s trust mechanism was an elegant solution to reconciling the legal rights inherent in joint legal custody with the need to allow the custodial parent day-to-day management.
III
As judges we are limited in our ability to respond to every need for reform. The Legislature makes the laws; we don’t. The trial judge here was—as are we on this court today—bound by the child support statutes found in sections 4050 through 4076 of the Family Code, no matter how much hardship and havoc they might wreak.
The trial judge’s order was within the law as written by the Legislature and, in fact, did an admirable job of harmonizing ostensibly conflicting strands with the legislative scheme. While I hope that the Legislature soon acts to correct the inequities which the courts have noted in the guideline system, the fact remains that today’s result is not dictated by the plain text of the statute, but by words which the judiciary must necessarily interpret. The trial judge here was not bound to exacerbate a bad situation by an interpretation that exaggerates some of the most absurd tendencies of the legislation. Nor are we.
The majority opinion boils down to this: millions for Barbie dolls, not one cent for college. I respectfully disagree. The trial judge’s order should be affirmed.

 This course was even more prudent than one might at first realize. Lana’s child support obligation will end at about the same time when Ashley will be ready for college. (See Fam. Code, § 3901, subd. (a).) Therefore there was even more reason for the trial judge to establish a trust to allow Ashley to share in Lana’s current affluence in an intelligent and prudent—as distinct from financially profligate—manner.

 If and when the Legislature gets around to revising the child support statutes, perhaps it could adopt some terminology more appropriate to the United States and less to medieval Europe, where “station in life”—e.g., noble, freeman, artisan, serf—really did have some legal significance. Ours is a country, to borrow from Justice Harlan’s famous line, that recognizes no castes.

 To reiterate: Setting up an investment portfolio for the child of an affluent parent serves the child’s best interests much more than the continual dissipation of money so as to inflate the child’s supposed current needs.